UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JENNIFER DANNER, individually and personally
And as the Administratrix of the ESTATE OF
DEBBORAH DANNER, DECEDENT,

<table>
<tr><td></td><td>Civil Action No.</td></tr>
<tr><td>Plaintiffs,</td><td><b>18-332</b></td></tr>
</table>

   -against-

THE CITY OF NEW YORK;
NEW YORK CITY POLICE DEPARTMENT,    FIRST AMENDED
JAMES O'NEILL, Commissioner of Police     COMPLAINT
Department of the City of New York, and
Lieutenant MING FANG HO,
Sergeant HUGH BARRY Shield No. 4738,
Police Officer MICHAEL GARCES, Shield No. 9180,  JURY TRIAL
Police Officer JOHN MARTIN, Shield No. 22241,   DEMANDED
P.O. CAMILO ROSARIO, Shield No. 17378,
Police Officer JABBOUR RABADI, Shield No. 20356, and
Police Officer JAVIER PEREZ, Shield No. 18458,
And all natural defendants are sued Individually and in
their official capacities,           ECF CASE

         Defendants.
------------------------------------------------------------------------x

   Plaintiffs, JENNIFER DANNER, individually and personally and JENNIFER DANNER as the Administratrix of the ESTATE OF DEBORAH DANNER, decedent, by and through their attorney, RICARDO A. AGUIRRE, ESQ., hereby bring this action under 42 U.S.C. §1981 and 1983 *et. seq.* the United States Constitutional Amendments and the common and statutory laws of New York, to redress their civil and legal rights, and allege as follows:

## PRELIMINARY STATEMENT

   1.  This is a civil rights action in which the plaintiffs seek relief for the defendants' violations of their rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, by the United States Constitution, including the Fourth, Fifth and Fourteenth

Amendments, and by the laws and Constitution of the State of New York. Plaintiffs seek compensatory and punitive damages, an award of costs, interest, attorney's fees, and such other and further relief as this Court deems just and proper.

2.     This action has been commenced within one year and ninety days after Plaintiff's claim arose by reason of the killing of DEBORAH DANNER by the defendants.

## JURISDICTION AND VENUE

3.     This action is brought pursuant to 42 U.S.C. §1981, §1983, §1986, §1988 and the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and the laws of the State of New York.  Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and §1343, this being an action seeking redress for the violations of plaintiffs constitutional and civil rights.

4.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the case or controversy.

5.     Venue in this District is proper under 28 U.S.C. § 1391 (b) and (c) in that Defendant CITY OF NEW YORK is administratively located within the Southern District of New York, and the events giving rise to this claim occurred within the boundaries of the Southern District of New York.

## JURY TRIAL DEMANDED

6.     Plaintiffs demand a trial by jury on each and every one of their claims as pleaded herein.

## PARTIES

7.     At all times relevant to this action, Plaintiff JENNIFER DANNER was and is currently a resident of Bronx County, New York.

8.     At all times relevant to this action, Plaintiff JENNIFER DANNER was and is the Administratrix of the ESTATE OF DEBORAH DANNER (hereinafter referred to as "THE ESTATE"), having been appointed the administratrix of the estate by Surrogate's Court in and for the County of the Bronx, City and State of New York, File No. 2016-2832, on December 21, 2016, by receipt of Letters of Administration. JENNIFER DANNER is at all times relevant herein a competent adult who appears both individually and as personal representative of DEBORAH DANNER, and is also the sole surviving sibling of DEBORAH DANNER, who appears by and through JENNIFER DANNER and may bring and maintain causes of action and recover damages for the value of the life of DEBORAH DANNER and also for decedent's pain, suffering, horror, and consciousness of her eminent demise. DEBORAH DANNER was survived by no spouse, child or parent, and she was in fair health for her age.

9.     Defendant CITY OF NEW YORK (hereinafter referred to as "CITY") is and was at all times a relevant municipal entity created and authorized under the laws of the City and State of New York.  It is authorized by law to maintain a police department namely The New York City Police Department (hereinafter referred to as "NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers. Defendant CITY was at all times relevant herein as the public employer of Defendants Lieutenant MING FANG HO (hereinafter referred to as

"LT. HO"), Sergeant HUGH BARRY (hereinafter "SGT. BARRY") Shield # 4738, Police

Officer MICHAEL GARCES (hereinafter referred to as "P.O. GARCES") Shield #9180,

Police Officer JOHN MARTIN (hereinafter referred to as "P.O. MARTIN")  Shield No.

22241, P.O. CAMILO ROSARIO (hereinafter referred to as "P.O. ROSARIO")  Shield

No. 17378, Police Officer JABBOUR RABADI (hereinafter referred to as "P.O.

RABADI")  Shield No. 20356, and Police Officer JAVIER PEREZ (hereinafter referred to

as "P.O. PEREZ")  Shield No. 18458.

10.     At all times relevant herein, defendant LT. HO was a police officer of the

NYPD and supervisory precinct and patrol official (Platoon Commander) in NYPD's 43rd

Police Precinct acting as an agent, servant and employee of defendant CITY and in

furtherance of the scope of his employment and acting under color of laws; to wit under

color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or

Police Department, and is sued herein in both his individual and personal capacity as well

as his official capacity. Upon information and belief, on the evening of October 18, 2016,

LT. HO's assignment was precinct and platoon commander in NYPD's 43rd Police Precinct

in the County of the Bronx and City and State of New York.

11.     At all times relevant herein, defendant SGT. BARRY was a police officer

of the NYPD and patrol official (Patrol Supervisor) in NYPD's 43rd Police Precinct, acting

as an agent, servant and employee of defendant CITY and in furtherance of the scope of

his employment and acting under color of laws; to wit under color of statutes, ordinances,

regulations, policies customs and usages of the CITY and/or Police Department, and is

sued herein in both his individual and personal capacity, as well as his official capacity.

Upon information and belief, at no time relevant had SGT. BARRY taken training in

"Crisis Intervention Training" (hereinafter "CIT") which is designed to educate and train NYPD officers in de-escalating tensions during police encounters with emotionally disturbed persons (hereinafter "EDPS"); which training facilitates police interaction with EDPS without violent injuries or death to the EDP and responding patrol officers. On the evening of October 18, 2016, SGT. BARRY'S assignment was patrol supervisor in NYPD's 43rd Police Precinct in the County of the Bronx and City and State of New York.

12.     At all times relevant herein, defendant P.O. GARCES was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department and is sued herein in both his individual and personal capacity, as well as his official capacity.  On the evening of October 18, 2016, P.O. GARCES' assignment was that of patrol officer in NYPD's 43rd Police Precinct in the County of the Bronx and City and State of New York.

13.     At all times relevant herein, defendant P.O. MARTIN was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department and is sued herein in both his individual and personal capacity, as well as his official capacity.  On the evening of October 18, 2016, P.O. MARTIN's assignment was that of patrol officer in NYPD's 43rd Police Precinct in the County of the Bronx and City and State of New York.

14.     At all times relevant herein, defendant P.O. ROSARIO was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department and is sued herein in both his individual and personal capacity, as well as his official capacity.  On the evening of October 18, 2016, P.O. ROSARIO's assignment was that of patrol officer in NYPD's 43rd Police Precinct in the County of the Bronx and City and State of New York.

15.     At all times relevant herein, defendant P.O. RABADI was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department and is sued herein in both his individual and personal capacity, as well as his official capacity.  On the evening of October 18, 2016, P.O. RABADI's assignment was that of patrol officer in NYPD's 43rd Police Precinct in the County of the Bronx and City and State of New York.

16.     At all times relevant herein, defendant P.O. PEREZ was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department and is sued herein in both his individual and personal capacity, as well as his official capacity.  On the evening of October 18, 2016, P.O. PEREZ's assignment was that

of patrol officer in NYPD's 43rd Police Precinct in the County of the Bronx and City and State of New York.

17.     Defendant O'NEILL was at all times relevant the Commissioner of the NYPD and responsible for the setting and implementation of policy, both written, oral and informal practices, including NYPD officers' police conduct, both of commission and omission, and is sued herein in both his individual and personal capacity as well as his official capacity.

<u>**NOTICE OF CLAIM**</u>

18.     Plaintiffs timely filed a Notice of Claim with the Comptroller of the City of New York, setting forth the facts underlying Plaintiffs' claim against Defendants, CITY OF NEW YORK, et al.

19.     The City assigned a claim number to Plaintiff's case, to wit: TT 2016-039983 and Plaintiffs were subjected to an examination by defendants pursuant to N.Y.'s General Municipal Law. Sec. 50-H on May 18, 2017.

20.     To date, the dispute, claim or controversy presented herein and by the said Notice of Claim has not been settled or disposed of, and no compensation has been offered by Defendant, CITY OF NEW YORK, et. al., in response to the claims.

21.     This action has been commenced within one year and ninety days after plaintiffs' claims arose by reason of the defendants' killing of DEBORAH DANNER; a mentally disabled female senior citizen of color, in addition to the other unlawful acts against her specified below.

## FACTUAL AND GENERAL ALLEGATIONS
## APPLICABLE TO ALL COUNTS

### Personal Background

22.     DEBORAH DANNER was born in the United States in 1950 and developed dreams of becoming a writer. Throughout her life she wrote numerous essays that appeared on the Internet, and she maintained a large and diverse personal library that housed the writings of such authors as Hemmingway, Sartre, Chaucer and Nietzsche.  Ms. Danner was not only intellectually gifted, she was also a talented conversationalist.

23.     DEBORAH DANNER attended various higher education institutions where she majored in Computer Technology and was later employed as a technician. Unfortunately, the manifestation of her illness did not allow her to keep jobs for long periods of time.

24.     By the age of twenty, DEBORAH DANNER was diagnosed with a severe and disabling mental illness identified as Paranoid Schizophrenia. This disability was confirmed when the United States Office of Social Security Disability, found her to be totally disabled, and therefore qualified to receive Social Security Supplemental Income benefits.

25.     In addition to these benefits, DEBORAH DANNER was able to live on her own in the Jaimie Towers Cooperative Housing Complex located at 630 Pugsley Avenue, Apt. 7E, in the County of the Bronx, and City and State of New York, while her late mother Louise Danner and sibling, JENNIFER DANNER gave emotional and other support to each other. Louise Danner and JENNIFER DANNER also lived in the Jaimie Towers complex.

26.     On occasion, while living in said complex, DEBORAH DANNER would suffer from paranoia and fits of loud outbursts. In turn, if a neighbor would lodge a noise complaint with their resident precinct, the NYPD 43rd Police Precinct, police officers and emergency medical technicians (hereinafter "EMT") would be dispatched to DEBORAH DANNER'S apartment in an attempt to transport her to a local medical facility for psychiatric treatment. If DEBORAH DANNER refused medical attention and did not volunteer to go to the hospital, the police officers would request members of NYPD's elite Emergency Services Unit (hereinafter referred to "ESU") to respond to said apartment to transport DEBORAH DANNER to a hospital. ESU members are specially trained and equipped with non-lethal equipment to interact with EDPS in an effort to transport them to medical facilities in a safe manner.

27.     Since 2015, ESU responded to DEBORAH DANNER'S apartment on two (2) separate occasions and none of these responses had resulted in any violence by DEBORAH DANNER or deadly physical force used against her by NYPD officers in their efforts to successfully transport her to a local medical facility. Consequently, DEBORAH DANNER on and prior to October 18, 2016, was well known to the personnel of the NYPD 43rd Precinct as a mentally disabled, African-American female senior citizen suffering from clinical impairments of judgment and reason, with a history of being harmless.

<u>Deborah Danner Was Shot and Killed on October 18, 2016</u>

28.     On or about 6:00 p.m. on the evening of October 18, 2016, private building security guard Lieutenant Jayquan Brown of Prime Security, Inc., went to DEBORAH DANNER'S apartment after receiving a noise complaint from her neighbor.  It appears DEBORAH DANNER was speaking loudly to herself.

29.     Upon arrival, Lt. Brown who had previous encounters with DEBORAH DANNER when she experienced episodes of loud outbursts and boisterous talking, attempted to reason with her and informed her he would call for an ambulance so she could go to the hospital. DEBORAH DANNER refused and told Lt. Brown to go away.

30.     Lt. Brown then contacted the property manager Victor Berrios and informed him of DEBORAH DANNER'S outburst and that he was prepared to call for an ambulance. Mr. Berrios agreed and directed him to call 911.

31.     Lt. Brown called 911 and requested an ambulance be sent to DEBORAH DANNER'S address for her mental health condition. Because DEBORAH DANNER had allegedly torn down flyers from the hallway walls and was allegedly banging doors or cabinets in her apartment, Lt. Brown informed the 911 operator that DEBORAH DANNER was a violent EDP. However, she never threatened nor assaulted anyone.

32.     In addition to calling the 911 operator, Lt. Brown also called plaintiff JENNIFER DANNER, DEBORAH DANNER'S only sibling, who lived in an adjoining resident building in the same housing complex.

33.     On February 29, 2016, the Honorable Sharon A.M. Aarons of the Civil Term of Supreme Court of Bronx County (Index No. 91695-2015) appointed JENNIFER DANNER as DEBORAH DANNER'S guardian for her person and property due to her medical condition

34.     The 911 Communications Dispatcher, utilizing radio transmissions as their normal means of communication with patrol officers, dispatched two (2) Emergency Medical Technicians of the Fire Department of the City of New York, and several officers from NYPD's 43rd Precinct to DEBORAH DANNER'S residence. The Dispatcher also

10

gave notice to LT. HO, the NYPD 43rd Police Precinct's platoon and precinct commander that evening, a SGT. BARRY, the NYPD 43rd Police Precinct's patrol supervisor that evening and ESU, that officers and EMS were dispatched to DEBORAH DANNER'S apartment and that she was considered to be a "violent EDP".

35.    NYPD Patrol Guide Procedure No. 202-13 "LIEUTENANT – PLATOON COMMANDER", Paragraph 4, provided for on October 18, 2016, Platoon Commanders;

*Supervise and review actions of patrol supervisors to ensure compliance with Department policies and procedures.*

36.    During the evening of October 18, 2016, Defendant LT. HO, whose responsibility was to monitor radio transmissions to patrol supervisors and officers in the NYPD 43rd Police Precinct, heard or should have heard the 911 operator dispatching SGT. BARRY and police officers of the NYPD 43rd Police Precinct to DEBORAH DANNER'S residence and failed to request a specially trained CIT officer also be dispatched to said residence to assist in the handling of the alleged "violent" emotionally disturbed person, DEBORAH DANNER.

37.    LT. HO failed to respond or, in the alternative, make inquiries as to DEBORAH DANNER'S condition, cooperation, if any, and whether it was a dangerous condition.

38.    LT. HO failed to inquire if DEBORAH DANNER was armed with a weapon or any object that could be considered a dangerous and/or deadly instrument.

39.    LT. HO violated NYPD Patrol Guide Procedure No. 202-13, paragraph 4 when hearing that DEBORAH DANNER was alleged to be a violent EDP, he failed to contact SGT. BARRY and ensure SGT. BARRY complied with NYPD Patrol Guide

Procedure No. 216-05 - "MENTALLY ILL OR EMOTIONALLY DISTURBED PERSONS", Date Effective: 08/01/13.

40.     Defendants P.O. PEREZ and his partner P.O. ROSARIO were assigned the job to respond to DEBORAH DANNER'S apartment and were the first to arrive. Shortly thereafter, Defendants P.O. RABADI and P.O. GARCES arrived on the scene as back-up and EMTS Brittany Mullings and Patrick Moore arrived on the scene and stayed temporarily in the hallway.

41.     In sum and substance, P.O. ROSARIO knocked on DEBORAH DANNER'S apartment door which she in fact partially opened and yelled *"Get away from my door!"*, and asking him *"Who called you?"* P.O. ROSARIO calmly told Ms. Danner that they were called to check her out and provide her with assistance. DEBORAH DANNER stated that she did not need any help and told him to go away. P.O. ROSARIO was able to lodge his foot between the door and the door jamb, preventing her from closing the door. At some point P.O.S ROSARIO, PEREZ, RABADI and GARCES gained entry into the apartment. Upon seeing DEBORAH DANNER standing dressed in a nightgown in the middle of her apartment, it was clear and apparent to defendant officers that DEBORAH DANNER was alone and that there was no else in the apartment, no less anyone *in extremis*. i.e. anyone who was in immediate need of emergency medical care, nor anyone under threat of harm by a malefactor.

42.     DEBORAH DANNER retreated to her bedroom where she grabbed a pair of scissors and warned P.O. ROSARIO not to come in or she would fight him.

43.     Had LT. HO made an inquiry as to whether DEBORAH DANNER was uncooperative and armed with a dangerous instrument, LT. HO could have instructed the

responding officers and patrol supervisor to maintain a zone of safety, attempt to isolate and contain DEBORAH DANNER, not to attempt to physically restrain her and call for ESU to respond to the apartment. However, LT. HO never asked the 911 Operator *"Central, is the EDP violent? Is she armed with a dangerous instrument or a weapon?"* LT. HO either intentionally ignored the radio transmissions or was negligent in listening to the radio transmissions and failed to instruct the patrol supervisor and responding officers to abide by NYPD Patrol Guide Procedures in handling an uncooperative EDP.

44.      P.O. ROSARIO continued to speak to DEBORAH DANNER calmly and told her that he would bring EMS into the apartment to talk to her if she put the scissors down. DEBORAH DANNER placed the scissors on her night stand and EMT Mullings entered the apartment and began speaking to DEBORAH DANNER who got off her bed and walked to the hallway outside of her bedroom. She had calmed down considerably.

45.      Around this time, SGT. BARRY and his driver, Police Officer Martin arrived at the apartment. By coincidence they entered the same elevator car that JENNIFER DANNER was in, with her Guardianship documents in hand.  On the way up to the seventh floor, JENNIFER DANNER informed SGT. BARRY and P.O. MARTIN that ESU had removed DEBORAH DANNER'S apartment door on two separate occasions and asked them, if they did not have to, not to take the door off because it was expensive to replace it. Instead of making inquiries of DEBORAH DANNER'S mental health condition to assist him in handling the situation, he responded, in sum and substance, "Sometimes there is no easy way to do this!".

46.      Prior to going on patrol, all NYPD patrol supervisors are required to check the trunk of their radio motorized patrol vehicles to ensure there are non-lethal tools and

equipment to utilize when dealing with an uncooperative and/or violent suspect or EDP. This equipment includes a poly-carbonate shield, water cannon, restraining straps and a Shepard's crook.

47.     SGT. BARRY did not check to see if said equipment was in his patrol car, nor did he take any one of the tools, even though the 911 Communications Dispatcher informed him DEBORAH DANNER was an alleged violent EDP.

48.     Upon arrival at the apartment, at approximately 6:22 pm, SGT. BARRY found most of the officers in the living room and P.O. ROSARIO and EMS Technician Mullings speaking with DEBORAH DANNER. After P.O. ROSARIO briefed him of the situation, SGT. BARRY decided that he would not utilize any more time to coax DEBORAH DANNER to go to the hospital and, would instead, try to rush in, tackle and subdue her. SGT. BARRY then went over to the other officers and apprised them of what he planned to do. SGT. BARRY then asked the officers *"Are you ready?"* and began rushing towards DEBORAH DANNER. Upon hearing his question to the officers, DEBORAH DANNER asked *"Ready for what?"*, and after seeing SGT. BARRY and the officers rush towards her, she ran back into her bedroom, grabbed a baseball bat that was on her bed, sat on her bed and yelled *"Stay out!" "If you come in here I'll fight you!"*

49.     In this instance, SGT. BARRY destroyed the level of trust and confidence that P.O. ROSARIO and EMS Technician Mullings had established with DEBORAH DANNER to go to the hospital voluntarily and avoiding serious, if not, deadly violence.

50.     DEBORAH DANNER'S paranoia immediately manifested and caused her to believe that if the officers entered her bedroom they would do her harm. Paranoid schizophrenics are known to create "barriers" to prevent others from getting close enough

14

to harm them. Her barrier was the threshold of her bedroom. She repeated *"Stay out!"* *"If you come in here I'll fight you!"*

51.     SGT. BARRY willingly, recklessly and negligently breached said "barrier" and heightened DEBORAH DANNER'S fear of being harmed when he stood in her doorway, drew his firearm containing a magazine of 15 rounds of hollow point ammunition with one in the chamber and pointed his 9mm semi-automatic weapon at her body.

52.     At no time did SGT. BARRY tell his officers to stand down and retreat out of her bedroom as a measure to calm DEBORAH DANNER and ensure her safety, his safety and the safety of his officers. Instead he continued to point his weapon at her while telling her to *"Drop it!"* and *"Get the fuck down!"*.

53.     At no time did SGT. BARRY reach for his Taser or his pepper mace located on his gun belt. He chose not to use a non-lethal measure to subdue DEBORAH DANNER. Instead, he kept aiming his deadly weapon at the center mass of her body.

54.     At no time did SGT. BARRY isolate and contain DEBORAH DANNER by stepping out and, amongst other things, closing her bedroom door.

55.     At no time did he summon for ESU in view of the fact that he knew that he had just created a violent and potentially deadly situation.

56.     Instead, according to P.O. ROSARIO's eyewitness testimony, when DEBORAH DANNER slid down the side of her bed and stood up <u>without swinging the bat,</u> SGT. BARRY shot DEBORAH DANNER two times.

57.     Five minutes after arriving at her apartment, SGT. BARRY killed DEBORAH DANNER.

58.     After SGT. BARRY shot DEBORAH DANNER, EMT Mullings and Moore covered their heads and ran out of DEBORAH DANNER'S apartment and down the hall.

59.     Upon hearing the gunshots that killed her sister, JENNIFER DANNER was startled and exclaimed *"What happened?" "Did you shoot my sister?"*

60.     While stunned and shocked, JENNIFER DANNER attempted to run into DEBORAH DANNER'S apartment, but she was physically restrained by Lt. Brown.

61.     Then a hand protruded from DEBORAH DANNER'S apartment and summoned the EMTs to enter the residence.

62.     Shortly thereafter, DEBORAH DANNER was wheeled out on a stretcher in front of JENNIFER DANNER with one of the EMTs performing cardio pulmonary resuscitation (CPR) on DEBORAH DANNER. The EMTs had also inserted a tube into DEBORAH DANNER'S mouth.

63.     DEBORAH DANNER was transported in an ambulance to Jacobi Medical Center in the County of Bronx.

64.     For some reason, JENNIFER DANNER was not allowed to ride with DEBORAH DANNER, and instead rode to the hospital in another ambulance. JENNIFER DANNER was cruelly denied by the defendants her right to be with her sister one last time at the time of her death, and to say goodbye to her.

65.     Emergency medical professionals worked on DEBORAH DANNER in an attempt to save her life.

66.     Shortly thereafter, the physicians at Jacobi Hospital that treated DEBORAH DANNER came forth and informed JENNIFER DANNER that her sister had died of gunshot wounds.

<u>No Arrest Warrant and Lack of<br>Probable Cause to Arrest Deborah Danner</u>

67.     Upon arriving at DEBORAH DANNER'S apartment and seeing her calmly speak to P.O. ROSARIO and EMS Technician Mullings without a dangerous instrument in her hand, SGT. BARRY witnessed or should have witnessed DEBORAH DANNER was not a danger to herself or anyone in her apartment.

68.     Had SGT BARRY inquired further he would have been informed that DEBORAH DANNER did not commit a criminal offense against anyone outside her apartment.

69.     Had SGT BARRY inquired further he would have been informed that DEBORAH DANNER did not commit a criminal offense inside her apartment.

70.     Except for his responding officers being present in DEBORAH DANNER'S apartment, SGT. BARRY knew or should have known that there was no else in said apartment.

71.     DEBORAH DANNER clearly stated to SGT. BARRY and the responding officers that she was fine and wanted to remain in her apartment.

72.     NYPD Patrol Supervisors are tasked with verifying arrests made by the officers they are entrusted to supervise. If an officer fails to articulate that probable cause had been established when the arrestee committed or was about to commit a crime, then the patrol supervisor must void the arrest.

73.     SGT. BARRY knew or should have known DEBORAH DANNER did not and was not about to commit a crime, and, therefore, there was no probable cause to arrest DEBORAH DANNER.

74.     Neither SGT. BARRY nor his responding officers arrived at DEBORAH DANNER'S apartment with an arrest warrant to arrest DEBORAH DANNER.

75.     Knowing that neither probable cause existed nor or an arrest warrant was issued to legally arrest DEBORAH DANNER, SGT. BARRY authorized his officers to arrest DEBORAH DANNER and he, in fact, physically attempted to illegally arrest an elderly, mentally ill woman and remove her from her home in restraints. POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ did nothing to intercede or to prevent in what was clearly unlawful and unconstitutional use of physical force.

76.     When SGT. BARRY failed to apprehend and restrain DEBORAH DANNER, he unholstered his weapon, pointed his 9 mm semi-automatic handgun at DEBORAH DANNER, shot her twice and caused her to die. POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ again did nothing to intercede or to prevent in what was clearly unlawful and unconstitutional use of physical force.

77.     SGT. BARRY knowingly, willfully, recklessly and/or negligently violated NYPD Patrol Guide Procedure No. 208-1 – "LAW OF ARREST" when he attempted to illegally arrest DEBORAH DANNER without probable cause or an arrest warrant.

78.     SGT. BARRY knowingly, willfully, recklessly and/or negligently violated DEBORAH DANNER'S federal and civil rights under 42 U.S.C. §1981, §1983, §1986, the Fourth, Fifth, Eighth, and the Fourteenth Amendments to the United States

Constitution, and other violations of law codified in the statutes in the City and State of New York.

79.     By violating said procedure and laws, SGT. BARRY caused the unnecessary and unwarranted death of an innocent person.

NYPD'S Policy and Procedures Concerning the<br>Confrontation of Emotionally Disturbed Persons

80.     Defendant CITY's premiere law enforcement agency NYPD, its Police Commissioner Defendant O'NEILL and its administration created, maintain and update a compilation of rules, regulations and procedures that is utilized to direct police officers' actions during various encounters and responses on patrol. These procedures are found in the New York City Police Department Patrol Guide.

81.     NYPD Patrol Guide Procedure No. 216-05 "MENTALLY ILL OR EMOTIONALLY DISTURBED PERSONS", Date Effective: 08/01/13, provided for on October 18, 2016, that its *"purpose is to safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance."*

82.     In delineating the scope of the procedure, its preamble reads:

*"The primary duty of all members of the service is to <u>preserve human life</u>. The safety of ALL persons involved is paramount in cases involving emotionally disturbed persons. If such person is <u>dangerous to himself or others</u>, necessary force may be used to prevent serious physical injury or death. Physical force will be used ONLY to the extent necessary to restrain the subject until delivered to a hospital or detention facility. <u>Deadly physical force will be used ONLY as a last resort</u> to protect the life of the uniformed member of the service assigned or any other person present. If the emotionally disturbed person is armed or violent, no attempt will be made to take the EDP into custody without the specific direction of a supervisor unless there is an immediate threat of physical harm to the EDP or others are present. <u>If an EDP is not immediately dangerous, the person should be contained until assistance arrives.</u> If the EDP is unarmed, not violent and willing to leave voluntarily, a uniformed member of the service may take such person into custody.*

*When there is time to negotiate, all the time necessary to ensure the safety of all individuals will be used."* (Emphasis added)

83.     Prior to SGT. BARRY arrival, P.O. ROSARIO followed protocol and utilized patience, a calm demeanor and time to persuade DEBORAH DANNER to voluntarily go to a medical facility for psychiatric treatment. Conversely, SGT. BARRY disregarded the aforementioned protocol and utilized a failed physical approach that resulted in DEBORAH DANNER'S death.

84.     The aforementioned Patrol Guide procedure continues with specific instructions in handling EDPS that are cooperative and uncooperative, violent and non-violent; none of which SGT.BARRY utilized prior to killing DEBORAH DANNER.

85.     In NYPD Patrol Guide Procedure No. 216-05, under the caption "DEFINITIONS" the following instruction appears:

ZONE OF SAFETY - *The distance to be maintained between the EDP and the responding member(s) of the service. This distance should be greater than the effective range of the weapon (other than a firearm), and it may vary with each situation (e.g., type of weapon possessed, condition of EDP, surrounding area, etc.). A minimum distance of twenty feet is recommended. An attempt will be made to maintain the "zone of safety" if the EDP does not remain stationary.*

86.     DEBORAH DANNER remained stationary on her bed while holding a baseball bat and instructing the officers not to enter her room.

87.     P.O ROSARIO, the first responding officer to gain access to DEBORAH DANNER'S apartment, and who was not tasked with the duties of a patrol supervisor, established a zone of safety by remaining more than 20 feet outside DEBORAH DANNER'S bedroom where he spoke calmly to her and eventually persuaded her to put down the scissors that were in her hand.

88.     Upon his arrival, SGT. BARRY ignored DEBORAH DANNER'S warning that she would fight anyone that entered her bedroom, and as the patrol supervisor, failed to establish a zone of safety and remain at least 20 feet away from DEBORAH DANNER while she was seated on her bed holding a baseball bat.

89.     Instead, SGT. BARRY breached DEBORAH DANNER'S "barrier", entered her bedroom and shot her dead.

90.     SGT. BARRY willfully, recklessly and/or negligently disregarded and violated NYPD Patrol Guide Procedure No. 216-05, caption entitled "DEFINITIONS - ZONE OF SAFETY".

91.     In NYPD Patrol Guide Procedure No. 216-05, under the caption "PATROL SUPERVISOR" the following instructional paragraphs appear, provided for on October 18, 2016:

> *Paragraph 5. - Verify that Emergency Service Unit is responding, if required.*
> *a.   Cancel response of Emergency Service Unit if services not required.*

92.     The 911 Communications Transcript for October 18, 2016 in the NYPD 43rd Police Precinct, between 6:22 pm and 6:27 pm reveals that SGT. BARRY never verified if ESU was responding to DEBORAH DANNER'S apartment.

93.     Based on the two previous responses ESU made to DEBORAH DANNER'S apartment in 2015, had SGT. BARRY ensured ESU was responding and awaited their arrival before rushing into her bedroom, more than likely DEBORAH DANNER would be alive today.

94.   SGT. BARRY willfully, recklessly and/or negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, entitled caption "PATROL SUPERVISOR".

95.   NYPD Patrol Guide Procedure 216-05, Paragraph 6 provided for on October 18, 2016:

*Direct uniformed members of the service to take EDP into custody if unarmed, not violent, and willing to leave voluntarily.*

96.   DEBORAH DANNER was armed with a baseball bat and was not voluntarily leaving her apartment. Instead of complying with Paragraph 6, SGT. BARRY directed his officers to follow him into her bedroom in an attempt to restrain DEBORAH DANNER and forcefully restrain her for transport to a hospital. His non-compliance with the Paragraph 6 resulted in the death of an innocent, mentally ill senior citizen.

97.   SGT. BARRY willfully, recklessly and/or negligently disregarded and violated NYPD Patrol Guide Procedure No. 216-05, Paragraph 6.

98.   NYPD Patrol Guide Procedure No. 216-05, Paragraph 7 provided for on October 18, 2016:

*WHEN AIDED IS ISOLATED/CONTAINED BUT WILL NOT LEAVE VOLUNTARILY:*

*PATROL SUPERVISOR:*
*7. Establish firearms control.*
*  a. Direct members concerned not to use their firearms or use any other deadly physical force unless their lives or the life of another is in imminent danger.*

99.   DEBORAH DANNER was isolated and contained in her bedroom when she was seated on her bed after SGT. BARRY'S attempt to grab her. There was no one else in the room and she was not in imminent danger of serious physically injury or death up until SGT. BARRY shot her dead.

22

100.    SGT. BARRY failed to establish firearms control when he pulled out his firearm, pointed his weapon at DEBORAH DANNER and shot her dead when, in fact, there was no imminent danger of deadly physical force towards him and his officers.

101.    Tellingly, not one of the police officers in DEBORAH DANNER'S apartment drew their weapons and aimed their guns towards DEBORAH DANNER. SGT. BARRY was the only officer to brandish his firearm and shoot at DEBORAH DANNER.

102.    SGT. BARRY willfully, recklessly and negligently disregarded and violated NYPD Patrol Guide Procedure No. 216-05, Paragraph 7.

103.    NYPD Patrol Guide Procedure 216-05, Paragraph 8 provided for on October 18, 2016:

> *Deploy protective devices (shields, etc.).*
>
> *Employ non-lethal devices to ensure the safety of all present (see "ADDITIONAL DATA" statement - Authorized uniformed members of the service may use a conducted energy device (CED) to assist in restraining emotionally disturbed persons, if necessary.)*

104.    Patrol Supervisors are required to carry in their radio motorized patrol car non-lethal tools and equipment that can be used when confronting an EDP. These tools include a poly-carbonite shield, a portable water cannon, Sheppard's crook and restraining straps.

105.    SGT. BARRY failed to carry and utilize any of the non-lethal tools and equipment in his patrol car when he confronted DEBORAH DANNER.

106.    SGT. BARRY failed to un-holster and utilize his non-lethal conducted electronic device, commonly known as a "Taser", that was located on his gun belt, when he confronted DEBORAH DANNER.

107.   SGT. BARRY failed to un-holster and utilize his non-lethal pepper spray container, commonly known as "Mace", that was located on his gun belt, when he confronted DEBORAH DANNER.

108.   SGT. BARRY willfully, recklessly and negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 8.

109.   NYPD Patrol Guide Procedure 216-05, Paragraph 9 provided for on October 18, 2016:

> Comply with provisions of P.G. 212-38, "Hostage/Barricaded Person(s)," where appropriate.

110.   SGT. BARRY had the time and opportunity to isolate and contain the uncooperative EDP DEBORAH DANNER, request the Hostage Negotiation Unit to respond to the apartment and attempt to persuade DEBORAH DANNER to voluntarily go to the local medical facility; but he chose not to request their assistance.

111.   SGT. BARRY willfully, recklessly and negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 9.

112.   NYPD Patrol Guide Procedure 216-05, Paragraph 10 provided for on October 18, 2016:

> Establish police lines if not already done.

113.   SGT. BARRY did not establish police lines. Rather than restrict the movement of his officers and prevent them from entering DEBORAH DANNER'S bedroom while she was sitting on her bed holding her baseball bat, he rushed into her bedroom, drew his weapon and fatally shot DEBORAH DANNER.

114.   SGT. BARRY willfully, recklessly and/or negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 10.

115.    NYPD Patrol Guide Procedure 216-05, Paragraph 11 provided for on October 18, 2016:

> *Request response of hostage negotiation team and coordinator through Communications Section.*

116.    SGT. BARRY failed to request the response of the hostage negotiation team and Coordinator through the Communications Section.

117.    SGT. BARRY willfully, recklessly and negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 11.

118.    NYPD Patrol Guide Procedure 216-05, Paragraph 12 states:

> *Notify desk officer that hostage negotiation team and coordinator have been notified and request response of precinct commander/duty captain.*

119.    SGT. BARRY failed to notify the NYPD 43rd Police Precinct desk officer that the hostage negotiation team and coordinator have been notified because he failed to request said team and coordinator. SGT. BARRY also failed to request the response of LT. HO, the platoon commander and/or the assigned Bronx Borough Command duty captain.

120.    SGT. BARRY willfully, recklessly and/or negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 12.

121.    NYPD Patrol Guide Procedure 216-05, Paragraph 13 states:

> *Request Emergency Service Unit on scene to have supervisor respond.*

122.    SGT. BARRY failed to request ESU respond to DEBORAH DANNER'S apartment.

123.    SGT. BARRY willfully, recklessly and negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 13.

124.    NYPD Patrol Guide Procedure 216-05, Paragraph 14 provided for on October 18, 2016:

> *If necessary, request assistance of:  a. Interpreter, if language barrier, b. Subject's family or friends, c. Local clergyman, d. Prominent local citizen, e. Any public or private agency deemed appropriate for possible assistance.*

125.    SGT. BARRY failed to call any of the aforementioned individuals, including Plaintiff JENNIFER DANNER who was standing in the hallway, to assist him in convincing DEBORAH DANNER to voluntarily go to the hospital.

126.    SGT. BARRY willfully, recklessly and negligently disregarded and violated NYPD Patrol Guide Procedure 216-05, Paragraph 14.

127.    An additional note added to NYPD Patrol Guide Procedure 216-05 provided for on October 18, 2016:

> *NOTE: The highest ranking uniformed police supervisor at the scene is in command and will coordinate police operations. If the mentally ill or EDP is contained and is believed to be armed or violent but due to containment poses no immediate threat of danger to any person, no additional action will be taken without the authorization of the commanding officer or duty captain at the scene.*

128.    DEBORAH DANNER was isolated and contained in her bedroom and posed no immediate threat of danger to any person. SGT. BARRY took additional action by entering her bedroom, pointing his firearm at her and fatally shooting DEBORAH DANNER without the authorization of platoon commander LT. HO or the duty captain whom he failed to solicit.

129.    SGT. BARRY willfully, recklessly and negligently disregarded and violated the additional note found in NYPD Patrol Guide Procedure 216-05.

130.    Defendant SGT. BARRY acted with deliberate indifference and malice in both violently breaking and entering the private residence of DEBORAH DANNER, and

then advancing into the private confines of her own bedroom and then by advancing upon her and menacing her with a firearm as she sat upon her own bed in her own bedroom by herself.

### The Criminal Indictment of Sergeant Hugh Barry

131.    On May 30, 2017, the Grand Jury of Bronx County handed down a true Bill of Indictment against defendant herein, SGT. HUGH BARRY, No.1104-17. That indictment charged defendant herein SGT. BARRY with four counts of killing plaintiff's decedent herein, DEBORAH DANNER with, to wit: Murder in the Second Degree, Manslaughter in the First Degree, Manslaughter in the Second Degree, and Criminally Negligent Homicide. The District Attorney of Bronx County, who is an employee of the defendant herein, CITY OF NEW YORK, also charged and arrested the defendant herein, SGT. HUGH BARRY on or about May 30, 2017.

132.    Defendant herein SGT. BARRY in fact had appeared and testified before the Grand Jury of Bronx County on or about February 2017. Upon information and belief, defendant SGT. BARRY herein, in an effort to conceal his wrongful, unlawful and tortious killing of DEBORAH DANNER, gave therein perjured testimony by falsely testifying under oath that DEBORAH DANNER wielded and swung a baseball bat at him, and that he, SGT. BARRY, felt he had to shoot and kill DEBORAH DANNER because he was *"scared of her"* and/or *"in fear of her"*. Upon information and belief, defendant herein SGT. BARRY also attempted to suborn perjury before the Grand jury of the other officers he was responsible for supervising on October 18, 2016. Defendant SGT. BARRY, in an attempt to fabricate a justification under law for his killing of DEBORAH DANNER, specifically alleged that DEBORAH DANNER had swung a baseball bat at him.

Defendant SGT. BARRY, upon information and belief, was at all times relevant herein, a Caucasian male of Irish-American ancestry approximately six feet tall, two hundred and twenty-five pounds, aged 31 and in excellent health, who on October 18, 2016 did not reside in the community which he was purported protecting, Bronx County, but rather resided in Hawthorne, New York which is located in Westchester County. DEBORAH DANNER was at all times relevant herein five feet six, a government-adjudicated disabled 66-year-old African-American female who resided for most of her life in the community in which she was killed, Bronx County.

133. On May 31, 2017, defendant herein SGT. BARRY appeared in front of NYS Supreme Court Judge Robert Neary and was arraigned upon the said four counts of the killing of DEBORAH DANNER. During his arraignment in the Supreme Court in and for Bronx County, defendant SGT. BARRY herein, by his paid agent, spokesperson and criminal defense counsel Andrew Quinn, Esq., with SGT. BARRY standing at the side of his criminal defense counsel, remained silent and without raising any objection, falsely, maliciously and without conscience, blamed the victim decedent DEBORAH DANNER for the entire incident by telling the arraignment judge that DEBORAH DANNER purportedly had "scared" SGT. BARRY, or threatened him with a bat.

134. Moreover, immediately subsequent to said arraignment and just outside the Bronx County Hall of Justice, defendant SGT. BARRY authorized his other paid spokesman, Ed Mullins, President and Business Agent for the Sergeant's Benevolent Association (the NYPD sergeant's police union) of which SGT. BARRY was then a member and financially supported for two years as a regular dues contributor, to falsely, maliciously and without conscience repeat the intentional falsehood which SGT. BARRY

28

had just ratified and adopted inside the courthouse during the arraignment,  to wit: that SGT. BARRY, reinforced by at least five other fully armed officers, defendants herein POLICE OFFICERS GARCES, MARTIN, P.O. ROSARIO, RABADI and PEREZ, killed DEBORAH DANNER because DEBORAH DANNER purportedly possessed a bat, and because SGT. BARRY was "scared" of her. SGT. BARRY'S authorized spokesman and agent, Ed Mullins, added or implied that SGT. BARRY, trained in hand to hand combat, including " leg sweeps' and other  widely known "takedown" techniques or martial arts in the police academy, did  not know how to or was not otherwise able to disarm an elderly disabled female whom he claimed held a bat, and this after SGT. BARRY was employed to work on the streets of New York County, the county where he beat up two prior plaintiffs, for six years prior to his being assigned to Bronx County in the 43rd as a sergeant for two years. SGT. BARRY'S paid agent and spokesman, Ed Mullins in that courthouse press conference added that the reason that his union member SGT. BARRY feared DEBORAH DANNER and thus was justified in shooting and killing DEBORAH DANNER was because she was "robust" (viz., overweight). At the time these statements were made by Ed Mullins, it was the well settled law of the State of New York that union members and their union stand in a jural relationship of principal and agent such that the statements of the union President are made with an implied-in-law authority of SGT. BARRY.

## The Criminal Trial of Sergeant Hugh Barry

135.    On January 30, 2018, the criminal trial of SGT. BARRY commenced in front Judge Robert Neary; the same judge that arraigned SGT. BARRY and impaneled the grand jury for SGT. BARRY.

136.    Numerous individuals testified, and notable facts surfaced that concerned the shooting death of Deborah Danner, the number of EDP jobs NYPD officers respond to daily and the lack of training NYPD provides its' officers and supervisors when dealing with "violent" EDPS.

Training Newly Promoted NYPD Sergeants In<br/>Handling Emotionally Disturbed Persons

137.    Dr. Diana Falkenbach, a psychologist and faculty member at John Jay College testified that upon his promotion to the rank of sergeant, SGT. BARRY attended a course that provided information on understanding the various forms of mental illness that manifest in EDPS. One of which was paranoid schizophrenia.

138.    She stated the newly promoted supervisors are informed about paranoid schizophrenics react to other individuals, what to say and not to say to them and that they often created either tangible or intangible "barriers" to prevent individuals they perceive as threatening from coming close and harming them.

139.    What Dr. Falkenbach described was precisely what DEBORAH DANNER did when SGT. BARRY and his officers rushed towards her; she isolated herself in her bedroom, grabbed and held a bat and warned officers not to come in, otherwise she would fight them.

140.    When questioned by SGT. BARRY'S defense counsel Andrew Quinn, Esq. whether the rookie sergeants were instructed on how to deal with "violent" EDPS, Dr. Falkenbach stated the sergeants were not instructed on how to deal with "violent" EDPS.

141.    When Mr. Quinn asked Dr. Falkenbach if the sergeants were taught tactics for handling "violent" EDPS, she stated no.

142.     When Mr. Quinn asked Dr. Falkenbach if the administrators of the program ever discussed teaching sergeants how to handle EDPS, she stated yes, but someone in NYPD countermanded this recommendation due to mere budgetary considerations, which clearly elevated bureaucratic budgetary matters over the safety of the citizens of the City of New York.

143.     When Mr. Quinn asked Dr. Falkenbach who, in NYPD, decided not to teach the new sergeants how to handle "violent" EDPS, she stated she could not recall.

<u>DEBORAH DANNER'S Bullet Wounds</u>

144.     Medical Examiner, Dr. Melissa Pasquale-Styles, testified that DEBORAH DANNER suffered three deadly and tremendous impact wounds when SGT. BARRY shot her dead.  (There were three entry wounds caused by two projectiles as one round perforated the elbow and then re- entered the torso.)

145.     One bullet entered DEBORAH DANNER'S upper chest and the other bullet entered her left arm by her elbow and entered her torso causing irreparable internal organ damage.

146.     Dr. Pasquale-Styles was asked, in sum and substance, "What position did DEBORAH DANNER'S arm have to been in in order for her to have suffered the type of wounds which you have testified had she suffered?"

147.     Dr. Pasquale-Styles responded that DEBORAH DANNER'S arm would have been in close proximity to her torso but, in no way, elevated in a higher position.

148.     Testimony by eyewitness P.O. ROSARIO supported Dr. Pasquales-Styles finding when he demonstrated how DEBORAH DANNER was holding the baseball bat; it was close to her body and not elevated.

149.    While under cross-examination, SGT. BARRY demonstrated how DEBORAH DANNER allegedly held the baseball bat; with her arm elevated; not touching or contiguous to her ribs and chest, which is much less aggressive than a baseball batter's pose when he or she is about to swing their bat.

150.    SGT. BARRY'S testimony contradicted Dr. Pasquale-Styles' medical finding and P.O. Camilo P.O. ROSARIO's eyewitness testimony.

Perjured Testimony Rendered by Sgt. Barry,<br>P.O. Garces, P.O Rabadi and P.O. Perez

151.    NYPD Patrol Guide Procedure 203-08 – "MAKING FALSE STATEMENTS" provided for on January 30, 2018:

> *The intentional making of a false statement is prohibited and will be subjected to disciplinary action, up to and including dismissal.*
> *Examples:  Lying under oath during civil, administrative and/or a criminal proceeding."*

152.    The most consistent testimony given by the witnesses that were present in DEBORAH DANNER'S came from P.O. ROSARIO, P.O. MARTIN, and EMS Technicians Brittany Mullings and Patrick Moore.

153.    Said testimony clearly illustrated P.O. ROSARIO's entry into the apartment, his interaction with DEBORAH DANNER, the entry of DEBORAH DANNER into her bedroom, the grabbing of scissors by DEBORAH DANNER, P.O. ROSARIO's success in getting DEBORAH DANNER to put down the scissors, the entry of EMS Technician Brittany Mullings into DEBORAH DANNER'S apartment and her subsequent interaction with DEBORAH DANNER, the reduction of outbursts and the calming of DEBORAH DANNER, her entry from her bedroom into the hallway, SGT. BARRY'S arrival and subsequent fatal shooting of DEBORAH DANNER.

32

154.    However, the testimonies of SGT. BARRY, P.O. GARCES, P.O. RABADI, and P.O. PEREZ were inconsistent, contradictory, implausible and false.

155.    During direct examinations of P.O. GARCES, P.O. RABADI, and P.O. PEREZ, Bronx Assistant District Attorney Wanda Perez-Maldonado had to impeach her own witnesses when their testimonies were inconsistent with their previous grand jury testimony.

156.    During his testimony, P.O. GARCES changed his testimony concerning the amount of time SGT. BARRY was in DEBORAH DANNER'S bedroom before he shot her dead.

157.    P.O. GARCES violated NYPD Patrol Guide Procedure 203-08 – "MAKING FALSE STATEMENTS" when he gave false testimony in SGT. BARRY'S criminal trial.

158.    During his testimony P.O. RABADI testified that EMT Mullings never stepped into DEBORAH DANNER'S apartment and spoke to DEBORAH DANNER when in fact she did.

159.    During his testimony P.O. PEREZ also testified that EMT Mullings never stepped into DEBORAH DANNER'S apartment and spoke to DEBORAH DANNER when in fact she did. P.O. PEREZ was adamant that she was not in the apartment when he emphasized *"Absolutely not!"*

160.    Contrary to P.O. RABADI's and P.O. PEREZ's false testimony, SGT. BARRY, P.O. ROSARIO and EMT Mullings all testified that EMT Mullings entered the apartment and spoke with DEBORAH DANNER.

161.   P.O. RABADI and P.O. PEREZ both violated NYPD Patrol Guide Procedure No. 203-08 – "MAKING FALSE STATEMENTS" when they gave false testimony in SGT. BARRY'S criminal trial.

162.   The most egregious false testimony was given by SGT. BARRY when he took the stand in his own defense.

163.   SGT. BARRY admitted that he was several feet away from DEBORAH DANNER while she brandished her baseball bat, which is contrary to his grand jury testimony where he testified she was a foot away from him.

164.   SGT. BARRY had conveyed to his attorney and Sergeant Benevolent Association President Ed Mullins that DEBORAH DANNER was "swinging" her baseball bat at him and that she had "scared" him.

165.   P.O. ROSARIO, the only eyewitness in DEBORAH DANNER'S bedroom when she was shot dead by SGT. BARRY, testified that at no time did DEBORAH DANNER swing her baseball bat at SGT. BARRY.

166.   SGT. BARRY falsely testified that it was he that spoke to DEBORAH DANNER and got her to put her scissors down.

167.   P.O. ROSARIO and EMS Technician Mullings both testified it was P.O. ROSARIO that spoke with DEBORAH DANNER and convinced her to put the scissors down.

168.   SGT. BARRY falsely testified that he never spoke with P.O. ROSARIO and, instead spoke only to P.O. PEREZ when he entered the apartment.

169.   P.O. ROSARIO testified he briefed SGT. BARRY about what was going on with DEBORAH DANNER before SGT. BARRY rushed into her bedroom.

170.    P.O. PEREZ testified he had stationed himself at the apartment's entrance door and never mentioned he spoke or briefed SGT. BARRY when he arrived.

171.    SGT. BARRY falsely testified that he believed DEBORAH DANNER ran into her bedroom and grabbed her baseball bat when she saw him give a slight nod to his officers that he was going after her and that he never said anything to them that caused DEBORAH DANNER to run back into her bedroom.

172.    EMT Mullings testified that while she was speaking to DEBORAH DANNER in the apartment hallway she heard SGT. BARRY ask his officers *"Are you ready?"*, wherein DEBORAH DANNER responded, *"Ready for what?"* and then ran into her bedroom and grabbed her baseball bat.

173.    When asked why he did not take any of the non-lethal tools and equipment from his police vehicle to DEBORAH DANNER'S apartment, SGT. BARRY falsely testified that he did not take the equipment because he had to first assess the situation.

174.    SGT. BARRY'S response contradicts elemental logic, contradicts all adult human experience, and is also lacking in any tactical sense. If upon arrival there was an immediate need to use non-lethal tools to subdue DEBORAH DANNER instead of utilizing deadly physical force, SGT. BARRY or his driver, P.O. Martin, would have had to go down seven stories, go to their vehicle, retrieve the equipment and return to apartment when it was too late to utilize the tools.

175.    Without solicitation, SGT. BARRY volunteered an incredulous remark by stating, in sum and substance, *"Anyway if I had taken the shield with me and they were bringing her down and she saw the shield, she would've probably freaked out!"* (The shield SGT. BARRY was referring to was the poly-carbonite shield that is utilized to push EDPS

35

back and/or protect the officers from the EDPS rushing at them with a weapon or tossing a toxic chemical. This device is one of the several tools patrol supervisors are required to carry in their police vehicles.)

176.    When asked why he did not deploy and utilize his conducted electrical device "Taser" and pepper spray "Mace" instead of his weapon, SGT. BARRY scoffed at the question and falsely responded, *"There was no time!"*

177.    SGT. BARRY'S defense attorney exhorted in his opening statement that SGT. BARRY had only "8/10ths" of a second to react when DEBORAH DANNER swung her baseball bat at him.

178.    SGT. BARRY also had a bio-medical engineer testify that after conducting test with three women (none of which resembled DEBORAH DANNER in height and weight) swinging a baseball bat at a laboratory dummy's head he concluded SGT. BARRY only had "8/10ths" of a second to react to someone swinging a baseball bat at his head.

179.    P.O. ROSARIO, the only eyewitness in DEBORAH DANNER'S bedroom when she was shot dead by SGT. BARRY, testified that at no time did DEBORAH DANNER swing her baseball bat at SGT. BARRY.

180.    Furthermore, P.O. GARCES, P.O. MARTIN and P.O. ROSARIO all testified that there were more than "8/10ths" of one second from the time SGT. BARRY entered DEBORAH DANNER'S bedroom and shot her dead.

181.    SGT. BARRY had sufficient time to utilize his non-lethal "Taser" or "Mace" to subdue DEBORAH DANNER, but instead willfully, recklessly and/or negligently failed to utilize the non-lethal tools available to him and used his gun to shoot and kill DEBORAH DANNER.

182.    SGT. BARRY knowingly authorized or later ratified, by not disavowing his defense attorney's "Opening Statement" which was perjurious in multiple material parts, including but not limited to the claim by that counsel, while SGT. BARRY was seated beside him in hearing range, that "SGT. BARRY only had eight tenths of a second to respond to protect himself from DEBORAH DANNER", who was allegedly swinging a baseball bat.

183.    SGT. BARRY unarguably and undeniably perjured himself when he testified at his murder trial that he had no intent to <u>kill</u> Deb Danner, all as a result of his very own and  uncontroverted testimony at trial that he intentionally fired not one, but <u>two projectiles</u> (maximum expansion and therefore maximum damage hollow point projectiles) not in the air or in her general direction, but specifically in his own words directly at the center of her chest which he admitted on cross examination to be the area containing the heart and lungs of DEBORAH DANNER.

184.    As a direct and easily predictable result of the aforementioned defendants perjuring themselves during the homicide trial against SGT. BARRY, SGT. BARRY was found not guilty under the very high and demanding standard of "beyond a reasonable doubt".  However, that criminal court was the same criminal court which also had <u>denied</u> SGT.BARRY'S earlier pre-trial motion, to dismiss for alleged absence of probable cause. The Court during a pre-trial conference, on or about October 2017, expressly found that there was in fact probable cause, i.e. reason to believe that SGT. BARRY had committed homicide, manslaughter (1st and 2nd degree) and/or criminally negligent homicide.

185.    As of this writing, Plaintiffs are awaiting NYPD's Department Advocate's Office's decision to administer Charges and Specifications against SGT. BARRY, P.O.

GARCES, P.O. RABADI and P.O. PEREZ for violating said NYPD Patrol Guide procedures.

### SGT. BARRY'S Prior Excessive Force Conduct as a NYPD Police Officer

186. Defendant herein SGT. BARRY had been sued at least twice prior to killing DEBORAH DANNER. These lawsuits stemmed from alleged *civil rights violations* which consisted of SGT. BARRY having brutally beaten different citizens in separate and unrelated attacks by SGT. BARRY, in which actions at law the defendant CITY initially defended SGT. BARRY but then paid out settlements, upon information and belief, of $25,000.00 in the civil case of *Gregory Peters v. The City of New York* and $10,000.00 in a post-trial settlement of *Gabriel Diaz v. The City of New York*.

### Plaintiff Jennifer DANNER'S Emotional Damages

187. Amongst other things, Plaintiff JENNIFER DANNER suffered the loss of DEBORAH DANNER'S comfort and society as a direct result of the defendants' killing of her sister, DEBORAH DANNER.

188. Plaintiff JENNIFER DANNER was physically present on the seventh floor during the defendants' killing of her only sibling, DEBORAH DANNER, and was thus in the zone of danger when defendant SGT. BARRY fired the aforesaid multiple shots on the seventh floor of 630 Pugsley Avenue, Bronx, New York.

189. Plaintiff JENNIFER DANNER has been deeply traumatized by the wrongful conduct of the defendants herein, including loss of sleep, recurrent nightmares, depression, feelings of guilt for not preventing the shooting death of her only sister DEBORAH DANNER and loss of life's enjoyment.

190.    As a consequence of the defendants' violations of the decedent's federal and civil rights under 42 U.S.C. §1981, §1983, §1986, the Fourth, Fifth, Eighth, and the Fourteenth Amendments to the United States Constitution, and other violations of law, the plaintiff JENNIFER DANNER was mentally and emotionally injured and damaged as a proximate result of the decedent's wrongful death, including but not limited to plaintiff's loss of familial relations, decedent's society, comfort, protection, companionship, love, affection, solace and moral support.

191.    Plaintiff ESTATE, by and through JENNIFER DANNER, the personal representative of DEBORAH DANNER'S estate, is entitled to recover wrongful death damages pursuant to, *inter alia,* E.P.T.L. §5-4.1. Additionally, plaintiff is entitled to recover, pursuant to E.P.T.L. §5-4.3 for the reasonable value of funeral and burial expenses as well as any expenses or liens for medical assistance, ambulance transportation etc. which have been or may be asserted by any person or entity against the ESTATE.

192.    Plaintiff ESTATE is entitled to recover damages by and through JENNIFER DANNER, the personal representative of decedent's estate pursuant to her right of survivorship for the pain and suffering which DEBORAH DANNER endured as a result of the defendants' violations of her civil, statutory and common law rights.

193.    Plaintiffs found it necessary to engage the services of a private counsel to vindicate the rights of the decedent and the plaintiff's rights under the law. Plaintiff is entitled to an award of attorney's fees pursuant to statute in the event that they are prevailing parties in this action under 42 U.S.C. §1981, §1983, §1985-86, and §1988.

## COUNT ONE FOR RELIEF

### 42 U.S.C. §1981, §1983, §1986 AND THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS VIOLATIONS FOR TRESPASS, FALSE ARREST AND FALSE IMPRISONMENT

194.     Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "193" of the complaint as if fully set forth herein.

195.     On or about October 18, 2016 in the County of Bronx, City and State of New York, DEBORAH DANNER was unlawfully detained, arrested, and /or imprisoned at 630 Pugsley Avenue, Bronx, New York by agents of the defendant City of New York, including SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, defendants after their unlawful entry and consequently unlawful search of her residence.

196.     That the defendant CITY, through its agents, servants and/or employees including the police defendants herein acted against DEBORAH DANNER without probable cause or any written process in clear violation of _Payton v. New York_, 445 U.S. 573 (1980), a widely known and well settled fundamental of federal and New York State Constitutional Law declaring the sanctity of a citizen's personal residence and protecting it from police invasion.

197.     That consequently, the said police defendants acts were malicious, unlawful and not based upon warrant, probable cause or other legally cognizable justification, and therefore was a false arrest and imprisonment at the time of her unlawful arrest and imprisonment at 630 Pugsley Avenue, Bronx, New York, that DEBORAH DANNER had not committed any criminal act, or other unlawful act, nor represented a threat to any civilian.

198.     At the time of said unlawful arrest and imprisonment, the defendant POLICE OFFICERS knew or should have known in the exercise of due care, proper procedure and reasonable investigation, that the aforesaid detention, arrest, created limitations on  freedom of movement both by verbal command and by defendant SGT. BARRY'S brandishing a firearm at DEBORAH DANNER,  as well as the aforesaid police orders that DEBORAH DANNER exit her own residence, were unlawful, false and without probable cause or other lawful authority, or her consent, while she was conscious.

199.     The aforesaid detention, arrest, imprisonment and interference with the freedom of movement and the desire of DEBORAH DANNER to remain where she was situated, caused DEBORAH DANNER to suffer physical injuries, emotional injuries and psychological distress, anguish, anxiety, fear and humiliation, loss of freedom and subsequently, her own life.

200.     By reason of the foregoing, the defendants became liable to the ESTATE in a sum of money.

**COUNT TWO FOR RELIEF**

42 U.S.C. §1981, §1983, §1985, §1986 AND
THE FOURTEENTH AMENDMENTS VIOLATIONS

201.     Plaintiffs repeat and reiterate the allegations contained in paragraphs **"1'** through "200" of the complaint as if fully set forth herein**.**

202.     On October 18, 2016 the defendants intentionally, knowingly, recklessly, negligently and with malice caused the death of DEBORAH DANNER.

203.     The actions of defendants which caused the death of DEBORAH DANNER were in violation of 42 U.S.C. §1981, §1983, §1986 and the Fifth, Eighth and Fourteenth Amendments to the United States Constitution including the Procedural and Substantive

41

Due Process Clauses, and the guarantees against summary punishments and cruel and unusual punishments.

204.    DEBORAH DANNER had not committed any illegal acts at the time that she was killed by the defendants, or at the time that she was attempting to defend herself and her constitutional rights, nor did she present any danger at the time that the defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ menaced her, and subsequently assaulted her.

205.    DEBORAH DANNER, prior to the menacing and assault and battery by the defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, had not given the defendant CITY, its agents, servants or employees, including the above-mentioned defendants, any probable cause to believe that she had committed any illegal acts.

206.    The abovenamed defendants knew or should have known through the exercise of reasonable care and proper police procedure, that they acted without legal process or other legal authority.

207.    The defendant CITY, its agents, servants or employees including defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ wrongfully caused the death of DEBORAH DANNER by gunshot wounds.

208.    As a result of the foregoing gunshot wounds to DEBORAH DANNER by the said defendants, DEBORAH DANNER was caused to suffer severe emotional and physical pain, suffering, distress, anguish, fear, anxiety, humiliation and loss of life.

209.    By reason of the foregoing, the defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ became liable to the plaintiff in a sum of money.

## COUNT THREE FOR RELIEF

### 42 U.S.C. §1983, §1986 AND §1988
### EXCESSIVE USE OF PHYSICAL FORCE

210.    Plaintiffs repeat, and reiterate the allegations contained in paragraphs "1" through "209" of the complaint as if fully set forth herein.

211.    Defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ were at all times relevant herein duly appointed and acting as officers for defendant CITY's police department, NYPD.

212.    The conduct and actions of defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, indicate they were all acting in concert with defendant SGT. BARRY and under color of state law to wit: under the color of the statutes, ordinances, regulations, policies, customs and usage of the City and State of New York, used excessive physical force to detain, arrest, imprison and/or remove DEBORAH DANNER, or to attempt the same.

213.    On October 18, 2016 at 630 Pugsley Avenue, Bronx, New York, DEBORAH DANNER was in her own bedroom inside her own residence and had not committed any crime.

214.    Defendant SGT. BARRY first advanced upon DEBORAH DANNER who was standing in her hallway speaking to P.O. ROSARIO and EMT Mullings, then he menaced her with his semi-automatic firearm by brandishing it at her, and then fired multiple gunshots at DEBORAH DANNER striking her at least two times, knocking her

on to her bed, while defendant POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, who were under a constitutional obligation to intercede or to prevent under 42 U.S.C. §1983 and 42 U.S.C.§1986 in this said deprivation of federal civil rights but did nothing to intercede or to prevent in what was clearly unlawful and unconstitutional use of physical force.

215.    That said actions by defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ were unjustified by the actions of a disabled, African-American elderly female, DEBORAH DANNER, and constituted an unreasonable and excessive use of force by the said defendants.

216.    DEBORAH DANNER had not resisted arrest but had only lawfully refused to comply with the clearly unlawful command of defendant SGT. BARRY that she leave her own residence.

217.    The  said defendants actions were done intentionally, willfully, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of their acts, was done without lawful justification or reason and was designed and did cause specific and serious physical and emotional pain and suffering in violation of DEBORAH DANNER'S rights as guaranteed by 42 U.S.C. §1981, §1983, §1986  and the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, including the right to be free from unreasonable seizure of her person and the right to be free from the use of excessive, and unreasonable, and unjustified force .

218.    The actions alleged above deprived DEBORAH DANNER of the following rights under the United States Constitution:

    a.      Freedom from the use of excessive and unreasonable force;

44

b.      Freedom from summary punishment.

219.    The direct and proximate result of defendants' acts were that DEBORAH DANNER suffered physical injuries as previously set forth and was forced to endure great pain and mental suffering including, but not limited to, the shock of entry of bullet projectiles into her body, and the terror of knowledge of her impending doom and demise.

## COUNT FOUR FOR RELIEF

### MUNICIPAL LIABLILITY FOR CONSTITUTIONAL VIOLATIONS
### MONELL CLAIM AGAINST THE CITY OF NEW YORK – 42 U.S.C. §1983

220.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "219" of the complaint as if fully set forth herein.

221.    Defendant CITY directly caused the constitutional violations suffered by the Plaintiffs and is liable for the damages suffered by the Plaintiffs as a result of the conduct of the defendant officers. The conduct of the defendant officers was a direct consequence of the policies and practices of the defendant CITY.

222.    The acts complained of were carried out by the aforementioned defendants in their capacities as police officers, supervisors and officials pursuant to customs, policies, usages, practices, procedures and rules of defendant CITY and NYPD, all under the supervision of ranking officers of the NYPD.

223.    The aforementioned customs, practices, procedures and rules of defendant CITY and NYPD include, but are not limited to: 1) arresting and imprisoning  persons known to be innocent, and then supporting same by fabricating evidence, testimonial or physical, such practice in the NYPD being known therein as "Testilying";  2) failing to train only a small fraction of the 36,000 member NYPD police force in crisis intervention training for the safe response and action in dealing with emotionally disturbed persons as

45

of October 18, 2016;  3) failing to train  and maintain annual updated training of all police officer and newly promoted and veteran patrol supervisors in the handling of "violent" EDPS;   4) failing to design and implement a system of dispatching CIT trained officers/supervisors to locations and addresses known to be occupied by  EDPS or likely to be occupied by as such;   5) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction;  6) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 7) retaliating against officers who report police misconduct; 8) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision;  9) and allowing police officers and supervisors to render false testimony in administrative, civil and criminal trial proceeding without penalty.

224.    At the time of the aforementioned constitutional violations, defendant CITY and NYPD were and had been on notice of such unconstitutional conduct, customs, and *de facto* policies, such that the failure of defendant CITY and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part *infra*, the need for more effective supervision and other remedial measures was patently obvious, but defendant CITY and NYPD made no meaningful attempt to prevent future constitutional violations, if at all, until after the tragic death of DEBORAH DANNER.

225.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

a.  _Schoolcraft v. City of New York_, 10-CV-6005 (RWS) (S.D.N.Y) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

b.  _Long v. City of New York_, 09-CV-6099 (AJK) (S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.) (officer swears out a false complaint and is convicted of falsifying police records);

c.  _Taylor-Mickens v. City of New York_, 09-CV-7923 (RWS) (S.D.N.Y) (police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian complaint review Board against the precinct);

d.  _Lin v. City of New York_, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e.  _Colon v. City of New York_, 9-CV-0008 (JBW) (E.D.N.Y) (in an Order dated November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issue were prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

> _'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting POLICE OFFICERS of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration— through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'_

f. _People v. Arbeedy_, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. _Bryant v. City of New York_, 22011/2007 (Sup. Ct. Kings Co.) (Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. _Williams v. City of New York_, 06-CV-6601 (NGG) (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i. _MacNamara v. City of New York_, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. _McMillan v. City of New York_, 04-cv-3990 (FB)(RML) (E.D.N.Y.) (officers fabricated evidence against an African- American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k. _Avent v. City of New York_, 04-CV-2451(CBA)(CL) (E.D.N.Y.) (same);

l. _Smith v. City of New York_, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. *Powers v. City of New York*, 04-CV-2246 (NGG) (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n. *Nonneman v. City of New York*, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's non-suspicious, racially-motivated stop-and-frisk of a group of Hispanic youths);

o. *Richardson v. City of New York*, 02-CV-3651 (JG)(CLP) (E.D.N.Y.) (officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p. *Barry v. City of New York*, 01-CV-10627 (CBM) (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q. *White-Ruiz v. City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y., 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

r. *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against POLICE OFFICERS who exposed police misconduct and a failure to train in the police department).

226.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, are further evidenced, *inter alia*, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[1] {…}
>
> What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[2]

b. In June 2011, in the case in New York County Supreme Court entitled _People v. William Eiseman_ (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel.

---

[1] Mollen Commission report, p.36
[2] Mollen Commission Report, pp 40-41.
[3] Melissa Grace, _NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal_, Daily News, June 27, 2011, available at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288

The suspect was released. [4]   Moreover, prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[5]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e.  In December 2009, two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau. As explained in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct. Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes. [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources. Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

---

[4]Murray   Weiss,   *NYPD   in   a   Liar   Storm*,   N.Y.   Post,   Oct.   26,   2009   available   at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.
[5] Id.
[6] John Marzulli, *Claims of Corruption in Queens Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352.

To complete the ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from Precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[7]

f.  In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean Spencer falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[8]

227.   The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact are further evidenced, inter alia, by the following:

a. With respect to Fourth Amendment violations, in *Ligon v. City of New York*, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[9] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

---

[7] Id.
[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer*, N.Y. Daily News July 30,2010,available at http://www.nydailynews.com/new-york/brooklyn-cops-charged-barging-sting-operation-arresting-fellow-officer-bogus-charges-article-1.204251
[9] Id. at *34.

b. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states: In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[10]

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in _Colon v. City of New York_, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[11]

e. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact,

---

[10] Mollen Commission Report, pp. 2-3, available at pp. 2-3, available at
http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commissiono/%20-
%20NYPD.pdf.
[11] Loren Yaniv and John Marzuli, _Kelly Shrugs Off Judge Who Slammed Cops_
, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-
commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

and further demonstrates tacit approval, condoning, and/or encouragement of unconstitutional policies, customs, and practices.[12]

f. Regarding defendant City's tacit condoning and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[13] When it does, however, Commissioner Kelly controlled whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[14] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[15]

g.   Directly pertinent to the wholly unnecessary death of DEBORAH DANNER herein, is a Report by the defendant CITY's own Department of Investigation, by its Commissioner Mark Peters,  and its Inspector General  Phillip Eure  on January 19 and 20, 2017 lamenting the fact  of the  failure of the NYPD to train its entire force rather than just a small proportion of officers  in CIT, and  the NYPD's further failure to timely  design and implement  a system to dispatch at least one of the small number of its 35,000 officers trained  in CIT by October 18, 2016  to each location  or  address where  a confrontation   with an EDP is likely (under the uncontroverted facts at bar, a virtual certainty) (New York Daily News of  January 20, 2017).

---

[12] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements* , N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

[13]  In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

[14] Christine Hauser, *Few Results for Reports of Police Misconduct* , New York Times, October 5, 2009 at A19.

[15] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

h. The NYPD's historic and chronic failure to discipline its own workforce noted in the Mollen Commission is not outdated today.  Rather, that pattern, practice, and unspoken policy continues unabated and has indeed worsened over the years since. The Civilian Complaint Review Board (hereinafter "CCRB") has substantiated 1,179 violations by NYPD officers of the Department's rules between the years 2014-2016 but neither the current Commissioner of the NYPD  James  O'Neill nor his predecessor for 2014-2015, yet  William  Bratton failed to fire even one police officer during that three year period, and the total discipline imposed by the two Police Commissioners on their officers over the history of the 1,179 cases substantiated by the statutory-created CCRB, and the 475 cases of violations confirmed by the NYPD itself , resulted in only 20 officers having to give up 10 or more vacation days.  (New York Daily News of January 19, 2017).

i. United States Judge Jack Weinstein of the Eastern District of New York issued a decision on October 17, 2017 ironically published on October 18, 2017, the anniversary of the NYPD's killing of DEBORAH DANNER, entitled _Hector Cordero v The City of New York , P.O. Hugo Hugasian et. al._, 15-CV-3436.  In it he explained his denial of the City's motion to dismiss Cordero's Monell claims, and that he planned to hold a Monell hearing on the issue of widespread practice of lying at the NYPD, in the event that the plaintiff Cordero prevailed on his claims against the individual police officer, Hugasian. There, at page 2-4, Judge Weinstein cites the findings of experts in police practices who have found that (NYPD) police treat lying by police as the "norm" and "commonplace" and cites also expressions of shock and dismay by other judges in New York City on the degree of regularity and contemporary persistence of the problem. (_Decision at "PACER" website for the E.D.N.Y._ )

228.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, inter alia, by the following:

a. In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.[16]

b. In _Griffin v. City of New York_, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker

---

[16] Al Baker, _Bronx Police Precinct Accused of Using Quota System_ , N.Y. Times, Feb. 24, 2012, available at http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.

and faced other repercussions from fellow police officers that his supervisors failed to address.[17]

      c. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

      d. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

      e. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

229.     The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and defendant CITY, including without limitation, the current NYPD Commissioner, defendant O'NEILL

230.     The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and defendant NYPD Commissioner O'NEILL who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to

---

[17] Id at 389-92. See also Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times,  June 25, 2012, available at http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.

cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the false arrest, false imprisonment, malicious prosecution and even killing of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

231.    All of the foregoing acts by defendants deprived Plaintiffs of their federally protected rights, including, but limited to, the constitutional rights enumerated herein.

232.    Defendant CITY knew or should have known that the acts alleged herein would deprive Plaintiffs of their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

233.    Defendant CITY is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City Of New York and NYPD, and to require compliance with the Constitution and laws of the United States.

234.    Despite knowledge of such unlawful *de facto* policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City of New York, including defendant Commissioner O'NEILL, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active

encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

235.    The aforementioned defendant CITY's policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned policies, practices and/or customs, Defendants felt empowered to arrest, menace, threaten and shoot to death DEBORAH DANNER without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiffs' constitutional rights. Pursuant to the aforementioned policies, practices and/or customs, the officer-defendants herein as well as defendant O'NEILL failed to intervene in or to report or discipline the patrol officer-defendants for their violations of Plaintiffs' rights.

236.    Plaintiffs' injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

237.    As a result of the foregoing, Plaintiffs were deprived of their liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## COUNT FIVE FOR RELIEF

### SUPERVISORY LIABILITY

238.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1 through "237" of the complaint as if fully set forth herein.

239.   Defendant SGT. BARRY was at all times relevant herein duly appointed as a police officer of the New York City Police Department with the rank of sergeant and specifically assigned to the scene of the easily anticipable and highly likely-to-be confrontation with DEBORAH DANNER, despite the fact that he had never received CIT on how to deal with EDPS safely, humanely, and constitutionally. Also, SGT. BARRY never received training on how to deal with "violent" EDPS because, upon information and belief, an unidentified executive officer decided not to provide said training.

240.   At all times mentioned herein, defendant SGT. BARRY acted under color of the law, to wit, under the color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

241.   Defendant SGT. BARRY was, at all times relevant, a supervisory officer on the scene at 630 Pugsley Avenue, Bronx, New York, with responsibility for the investigation of the loud or boisterous talking that occurred inside that aforementioned address. In fact, defendant SGT. BARRY was not only implicitly a supervisor but also that evening of October 18, 2016, additionally expressly named the "Supervisor of the Shift" (i.e. in charge of many other officers). At a minimum, defendant SGT. BARRY was responsible for the supervision of all the officers during the investigation of the scene of loud or boisterous talking by DEBORAH DANNER.

242.   On October 18, 2016, Defendant herein LT. HO was the platoon and precinct commander of NYPD's 43rd Police Precinct during the last shift and thus the supervisor in charge of defendant herein SGT. BARRY; he or an officer acting at his instance and control, failed to dispatch an officer or sergeant who had undergone CIT

training, and subsequently, failed to monitor the events at the residence of DEBORAH DANNER in real time, despite his possessing the many technological means to do so.

243.    Upon information and belief, defendants SGT. BARRY and POLICE OFFICERS GARCES, RABADI and PEREZ, who were the responding officers, conspired to lie, mislead and misrepresent the circumstances surrounding the loud or boisterous talking.

244.    The aforementioned supervisor defendant SGT. BARRY, himself having committed the aforesaid unlawful, tortious and unconstitutional acts upon DEBORAH DANNER, failed to supervise his own subordinate police officers, defendants POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, and this resulted in the use of unnecessary force and other unlawful, tortious and unconstitutional acts against DEBORAH DANNER.

245.    Defendant SGT. BARRY, in turn, was himself completely left to operate unsupervised by defendant herein LT. HO, and this resulted in the excessive use of force and many other unlawful, tortious and unconstitutional acts against DEBORAH DANNER., and this resulted in the unnecessary use of force and other unlawful, tortious and unconstitutional acts against DEBORAH DANNER.

246.    Defendant LT. HO, in turn, was himself left unsupervised by defendant O'NEILL, until the death of DEBORAH DANNER, and this resulted in the use of unnecessary force and other unlawful, tortious and unconstitutional acts against DEBORAH DANNER as aforesaid.

247.    The aforementioned police supervisors had personal knowledge that unnecessary use of force and other unlawful, tortious and unconstitutional acts had been

used by his subordinates because they not only acquiesced in the conduct of their subordinates in the past and during the encounter with DEBORAH DANNER as it unfolded in real time, but also conspired to present a false account of the details of the confrontation. The aforementioned defendant police supervisor's indifference to the rights of DEBORAH DANNER by failing to act properly to investigate similar incidents as well as the incident at bar contributed to yet further violations of   DEBORAH DANNER'S civil rights.

248.    That by reason of the foregoing, defendant CITY is liable to the Plaintiffs for a sum of money.

## COUNT SIX FOR RELIEF

### ASSAULT AND BATTERY
### COMMON LAW CLAIM

249.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "248" of the complaint as if fully set forth herein.

250.    Defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, acting in concert, inflicted the torts of assault and battery upon DEBORAH DANNER.  The acts and conduct of those defendants were the direct and proximate cause of injury and damage to DEBORAH DANNER and violated her statutory and common law rights as guaranteed by the laws and constitution of the State of New York. Defendant SGT. BARRY and on information and belief, POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ also committed acts of battery against DEBORAH DANNER which included shooting her to the ground.

251.    Defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ'S acts constituted an assault upon DEBORAH

DANNER in that they intentionally attempted to injure DEBORAH DANNER or to commit a battery upon her, all without her consent while she was conscious.

252.    Defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ'S acts constituted a battery upon DEBORAH DANNER in that the above described bodily contact was intentional, unauthorized, and grossly offensive in nature., all without her consent while she was conscious.

253.    The actions of defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ were intentional, reckless, and unwarranted, and without any just cause or provocation, and defendant SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ knew, or should have known, that their actions were without consent of DEBORAH DANNER.

254.    The injuries sustained by DEBORAH DANNER were caused wholly and solely by reason of the conduct described, and DEBORAH DANNER did not contribute thereto.

255.    As a direct and proximate result of the foregoing, DEBORAH DANNER was subjected to great physical and emotional pain and humiliation, was deprived of her liberty and subsequently her life and was otherwise damaged and injured.

256.    That defendant CITY is responsible for the unlawful physical force, and assault and batteries employed by defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, because it occurred while they were acting in the scope of their employment and while they were performing actions as New York City Police Officers.

257.     As a result of the assault and battery and unwarranted physical force used against DEBORAH DANNER, she suffered gunshot wounds and great physical pain, emotional and psychological distress, anxiety, anguish, and subsequent loss of her life.

## COUNT SEVEN FOR RELIEF

### PENDANT CLAIM OF *PRIMA FACIE* TORT

258.     Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "257" of the complaint as if fully set forth herein.

259.     That by their actions, as set forth above, defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ inflicted harm upon DEBORAH DANNER without excuse or justification, arising out of the excessive use of physical force.

## COUNT EIGHT FOR RELIEF

### *RESPONDEAT SUPERIOR*

260.     Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "259" of the complaint as if fully set forth herein.

261.     The conduct of defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ occurred while they were on duty, in and during the course and scope of their functions and/or duties as NYPD police officers and whilst they were acting as agents and employees of the defendant CITY; consequently, defendant CITY is liable to the plaintiffs under the doctrine of *respondeat superior*.

## COUNT NINE FOR RELIEF

### NEGLIGENT SUPERVISION, RETENTION AND TRAINING

262.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "261" of the complaint as if fully set forth herein.

263.    Defendant CITY, negligently trained, retained and supervised defendants SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ. The Defendant CITY knew or should have known of the acts or conduct by them. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and constitution of the State of New York.

264.    Defendant CITY failed to provide Crisis Intervention Training to SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, as well all other police officers and supervisors similarly situated on patrol assignments. This gross failure on the part of Defendant CITY is particularly disturbing when it is estimated that these patrol supervisors and police officers encounter violent and non-violent EDPS numerous times, on a daily basis. Upon information and belief, a call for officers to respond to an EDP job occurs every 11 minutes throughout the five boroughs of New York City.

265.    Defendant CITY failed to provide training on how to handle "Violent EDPS" to SGT. BARRY and POLICE OFFICERS GARCES, MARTIN, ROSARIO, RABADI and PEREZ, as well all other police officers and supervisors similarly situated on patrol assignments. According to John Jay College Professor, Dr. Diana Falkenbach, someone made an executive decision not to train newly promoted supervisors on how to address EPDS when they are violent. Whether by executive fiat or because of budgetary concerns, this willful and wonton decision not to train patrol supervisors and officers on

64

how to properly handle EDPS when they are violent, could have prevented DEBORAH DANNER'S death.

266.    Defendant CITY failed to properly supervise and assess whether all supervisors and police officers were versed and knowledgeable of the rules and regulations contained in NYPD Patrol Guide Procedure 216-05 "MENTALLY ILL OR EMOTIONALLY DISTURBED PERSONS", Date Effective: 08/01/13.

267.    Defendant CITY was reckless and negligent when their police department, NYPD, retained SGT BARRY as a police officer and allowed him to be promoted to the rank of Sergeant when, in fact, they knew SGT. BARRY had a history of using excessive force on citizens when they settled two prior excessive force lawsuits.

268.    As a result of the foregoing, DEBORAH DANNER was deprived of her liberty, was subject to physical and emotional pain and suffering, and terror, and was otherwise damaged, injured and killed.

<u>**COUNT TEN FOR RELIEF**</u>

<u>42 U.S.C. §1983 and PENDANT OR ANCILLARY CLAIM
BY JENNIFER DANNER FOR LOSS OF CONSORTIUM</u>

269.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "268" of the complaint as if fully set forth herein.

270.    At all times relevant to this action, JENNIFER DANNER was and is the lawful sibling of DEBORAH DANNER and as such was entitled to the comfort, enjoyment, society and services of DEBORAH DANNER. By reason of the foregoing wrongful and negligent acts by the Defendants, JENNIFER DANNER was deprived of the comfort, enjoyment of the services and society of her sibling guaranteed to JENNIFER DANNER under the laws and constitution of the State of New York, which claims can be

adjudicated in this litigation under the Court's supplementary, ancillary or pendant jurisdiction. Moreover, the aforesaid injuries and damages were caused solely and proximately by the negligence of the defendants. Defendants caused JENNIFER DANNER to suffer loss of consortium, loss of society, affection, assistance, and fellowship all to the detriment of their sibling relationship.

## COUNT ELEVEN FOR RELIEF
### NEW YORK STATUTORY LAW OF WRONGFUL DEATH

271.   Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "270" of the complaint as if fully set forth herein.

272.   At all times relevant herein JENNIFER DANNER was the lawful and sole sibling of DEBORAH DANNER and as such was entitled to the comfort, enjoyment, society and services of her only sibling DEBORAH DANNER. By reason of the foregoing wrongful acts of the defendants, JENNIFER DANNER was deprived of the services and society of her sibling, guaranteed to JENNIFER DANNER under the laws and constitution of the State of New York and can be adjudicated in this litigation under the court's supplementary, ancillary or pendent jurisdiction. Moreover, the injuries and damages were caused solely and proximately by the negligence of the defendants. Defendants caused JENNIFER DANNER to suffer the loss of consortium, affection, assistance and fellowship all to the detriment of their sibling relationship., resulting in legal damages to plaintiff JENNIFER DANNER.

## COUNT  TWELVE  FOR RELIEF

### WRONGFUL DEATH BY NEGLIGENCE

273.     Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "272" of this complaint as if fully set forth herein.

274.     Defendants by and through their respective agents and employees proximately caused the death of decedent DEBORAH DANNER on October 18, 2016 as a result of their negligent conduct and or failure to act as set forth herein.

275.     As a result of the same, the defendants are liable to the plaintiff, ESTATE for damages in an amount to be determined at trial.

276.     As an actual and proximate result of the defendants' negligence and death of the decedent, plaintiffs JENNIFER DANNER and the ESTATE has also sustained pecuniary loss resulting from the loss of the comfort of society, services and assistance of her sibling DEBORAH DANNER, as well as funeral expenses, and any expenses for medical, ambulances and related expenses which any person or entity have or may assert or impose liens for all in an amount according to proof at trial.

## COUNT THIRTEEN FOR RELIEF

### NEGLIGENT OUTRAGEOUS INFLICTION OF EXTREME MENTAL AND EMOTIONAL DISTRESS

277.     Plaintiff repeats and reiterates each allegation contained n paragraphs "1" through "276" of this complaint as if fully set forth herein.

278.     At the time and place that the defendants killed DEBORAH DANNER, the plaintiff JENNIFER DANNER was present on the seventh floor of the building 630 Pugsley Avenue, Bronx, New York, in close proximity to the front door of the residence of DEBORAH DANNER.

279.   As a result of the same, JENNIFER DANNER was physically in the zone of danger when and where defendant SGT. BARRY outrageously repeatedly fired his firearm on October 18, 2016 indoors.

280.   JENNIFER DANNER heard the gunfire by defendant SGT. BARRY and was shocked and traumatized by same, not ever having heard live gunfire before in such close proximity, and was also thereby placed by defendant SGT. BARRY in great fear both for her own life and that of her sibling, DEBORAH DANNER, all of which extreme shock and emotional harm JENNIFER DANNER has not recovered from yet to date.

<u>COMPLIANCE WITH S.D.N.Y LOCAL CIVIL RULE 83.10</u>

281.   Pursuant to S.D.N.Y. Local Civil Rule 83.10 (1)(a), plaintiffs annexed as Exhibit "A" a NYS CPL § 160.50 release for sealed arrest records for the arrest that is the subject of the complaint, and for a list of all prior arrests, if any.

282.   Pursuant to S.D.N.Y. Local Civil Rule 83.10 (1)(b) and shortly after JENNIFER DANNER'S GBL §50H hearing on May 18, 2017, plaintiffs served Defendant CITY Medical Releases for all medical and psychological treatment records of DEBORAH DANNER for those injuries caused by defendants' conduct as alleged in the complaint.

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs request the following relief jointly and severally as against all of the Defendants:

a.    Permanent injunctions against the New York City Police Department from:
a) enjoining its refusal to immediately train all members of their police force in Crisis Intervention Training;

b) retaining any of its police officers who are adjudicated to have committed official perjuries in federal, state or municipal trials, including administrative trials and/or have lied in or out of court in all forms of media;

c) utilizing any form of deadly lethal force against Emotionally Disturbed Persons <u>who are still at distance</u>, unless the police officer is about to be stabbed or fired upon with a gun;

d) permitting police officers, sergeants and lieutenants on patrol from approaching <u>"Violent Emotionally Disturbed Persons"</u> without members of the Emergency Service Unit present, at least in the absence of any provable immediate exigency, i.e. life threatening circumstances.

b.      Award Plaintiffs compensatory damages in the amount to be determined by a jury;

c.      Award Plaintiffs punitive and exemplary damages in the amount to be determined by a jury;

d.      Award costs and interest and Attorney's fees pursuant to 42 U.S.C. §1988;

e.      Award costs of suit pursuant to 42 U.S.C. §1920 and §1988;

f.      The convening and empaneling of a jury to consider the merits of the claims herein; and,

g.      Award such other and further relief as this Court may deem appropriate and equitable as may be required in the interest of justice.

Dated:  Bronx, New York
        March 22, 2018

                                        By: /s/ Ricardo A. Aguirre, Esq. (RA-7086)

                                        LAW OFFICE OF RICARDO A. AGUIRRE
                                        *Attorney for Plaintiffs,*
                                        644 Soundview Avenue,
                                        Bronx, New York 10461
                                        Tel: (718)-542-9300
                                        Facsimile: (718)-542-2244
                                        Email: Aguirreesq@aol.com